UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

GREGORY B.[1],                              )
                                           )
          Plaintiff,                       )
                                           )
     v.                                    )     CIVIL NO.  2:19cv184
                                           )
ANDREW SAUL,                               )
Commissioner of Social Security,           )
                                           )
          Defendant.                       )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Disability Insurance Benefits (DIB), as provided for in the Social Security Act. 42 U.S.C. § 423(a), § 1382c(a)(3).  Section 405(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.  The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

---

[1]  To protect privacy, Plaintiff's full name will not be used in this Order.

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

      1.      The claimant meets the insured status requirements of the Social Security Act

through June 30, 2019.

2.     The claimant has not engaged in substantial gainful activity since July 1, 2015, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.     The claimant has the following severe impairments: hypertension, obesity, degenerative disc disease of the lumbar spine, migraine headaches, osteoarthritis of the lower extremities, degenerative joint disease of the bilateral knees, carpal tunnel syndrome of the right upper extremity, fibromyalgia, sleep apnea, neuropathy of the upper extremities, and polymyositis (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can never climb ladders, ropes and scaffolds and must avoid concentrated exposure of noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards.  The claimant cannot operate foot controls bilaterally or perform any overhead reaching bilaterally and is limited to frequent handling and fingering bilaterally.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on September 10, 1968 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8,     The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2015, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 20 - 28).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed his opening brief on October 29, 2019. On January 7, 2020, the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff replied on January 21, 2020. Upon full review of the record in this cause, this court is of the view that the ALJ's decision must be remanded.

A five-step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff was born on September 10, 1968 and was 50 years-old on the date last insured. Plaintiff was five-feet, nine-inches tall; weighed as much as 236 pounds; and had a resulting body

mass index (BMI) of 34.8. (AR 623.)

In November 2015, Plaintiff presented at the emergency department with throbbing left lateral thigh pain. (AR 912.) Examination revealed tenderness to palpation over the left lateral thigh to the left greater troch muscle. (AR 913.) In December 2015, examination confirmed decreased range of motion, bony tenderness, swelling, pain, crepitus, spasm, and decreased strength in the right shoulder; tenderness in the wrists; positive Tinel's sign and positive Phalen's sign; swelling, effusion, deformity, tenderness, and lateral collateral ligament tenderness in the left knee; and pain and tenderness in the lumbar back. (AR 237-38.)

In February 2016, Plaintiff presented at the emergency department after waking with pain in the right arm and right leg. (AR 864.) Plaintiff demonstrated decreased lumbar range of motion, positive straight leg raise test, and positive Stinchfield test in March 2016. (AR 545.) He sought emergency medical care in April 2016 after he developed right-sided headache, blurred vision, neck pain, and right arm numbness and tingling. (AR 837.)

Plaintiff presented at the emergency department in May 2016 with right-sided weakness, tingling, and numbness. (AR 318.) Doctors noted that Plaintiff's medical history included multiple transient ischemic attacks (TIA), glucose-6-phosphate dehydrogenase (G6PD) deficiency, hypertension, sleep apnea, and cervical disc herniations. *Id*. Doctors suspected that the most likely diagnosis was a TIA. (AR 320.) Plaintiff returned to the emergency department days later after chest palpitations awakened him from sleep. (AR 326.) En route to the hospital via ambulance, he developed radiating chest pain and dyspnea. *Id*. His symptoms resolved and doctors diagnosed vasculopathy. (AR 330.)

In July 2016, Plaintiff developed neck pain and tingling on the sides of the lips. (AR 592.)

Doctors attributed the facial tingling to a potential TIA. (AR 594.) Doctors admitted Plaintiff to the hospital with right-sided weakness and limping in September 2016. (AR 1352.) A CT scan of the brain confirmed small vessel ischemic changes in the periventricular white matter. (AR 1385.) During a neurology consultation that occurred during this hospitalization, Plaintiff averred that he had suffered migraine headaches for several years and that he suffered headaches that lasted up to a single day up to twice weekly. (AR 1400.) TIAs produced symptoms that were similar to migraine headaches. *Id*. An October 2016 CT scan of the head indicated periventricular white matter hypodensities that suggested chronic small vessel ischemia. (AR 1652.) Doctors diagnosed conversion disorder in November 2016 after Plaintiff again presented with tingling and numbness. (AR 664.) Plaintiff demonstrated hand tremors when he lifted the upper and lower extremities. (AR 934.) In early December 2016, Plaintiff engaged emergency medical care for occipital headache, left upper extremity heaviness and weakness, and left upper chest pain and pressure. (AR 960.) Doctors concluded that Plaintiff suffered a TIA. (AR 964.)

Later in December 2016, Plaintiff presented at the emergency department with right upper and lower extremity pain, right flank pain, decreased sensation, nausea, and weakness. (AR 999.) He stated that the symptoms were similar to those he experienced when he suffered previous TIAs. *Id*. A CT scan of the chest reflected densely calcified subcarnial lymph nodes, cardiomegaly with left ventricle hypertrophy, and collateralization of venous flow about the left chest wall. (AR 1020.) A CT scan of the pelvis reflected a circumscribed soft tissue mass that abutted the distal abdominal aorta near the bifurcation and shotty regional lymph nodes. (AR 1021.) Plaintiff presented at the emergency department at the end of December 2016 with chest pain that rated a ten on a ten-point scale of severity. (AR 1044.)

In January 2017, Plaintiff arrived at the emergency department with tingling in the left arm and rapid heartbeat. (AR 1069.) He returned to the emergency department later that month with shooting pain from the left arm to the left hand and a generalized headache. (AR 1083.) Doctors suspected that complex migraines might have produced his symptoms. (AR 1086.) Plaintiff developed chest pain and shortness of breath in February 2017. (AR 1113.) Several days later, he returned to the emergency department with left arm tingling and pain. (AR 683.) In March 2017, emergency department physicians treated Plaintiff for chest palpitations and observed that he experienced this symptom with frequency. (AR 1128.) An echocardiogram (ECG) indicated sinus rhythm with premature atrial complexes. (AR 1141.) Plaintiff returned to the emergency department later that month with left-sided weakness, tingling, and numbness. (AR 1143.) His son informed him that the left side of his face was drooping. *Id*. Examination confirmed facial droop and impaired coordination. (AR 1145.) Following discharge from the emergency department, Plaintiff presented for treatment of neck and facial pain and numbness. (AR 633.) Doctors suspected that a TIA or intracranial lesion could have produced the pain. (AR 635.)

Plaintiff presented at the emergency department in early April 2017 with right-sided pain and weakness. (AR 1200.) He was admitted to the hospital ten days later with headaches and elevated blood pressure. (AR 668.) He presented for treatment shortly thereafter for headaches and floaters in his field of vision. (AR 643.) Doctors again suspected that a TIA may have caused his symptoms. (AR 645.) Plaintiff presented for emergency medical treatment in May 2017 after he suddenly developed dizziness and right-sided weakness. (AR 1463.) Dizziness prevented him from being able to stand. *Id*. Examination demonstrated trace deep tendon reflexes in the arms

and knees and absent deep tendon reflexes in the ankles. (AR 1511.) A CT scan of the brain confirmed white matter microvascular ischemic changes. (AR 1530.) An MRI of the brain confirmed periventricular and subcortical white matter T2 and flair hyperintensities that could have reflected sequella of chronic microvascular ischemic disease. (AR 1532.) A Doppler ultrasound of the carotid and vertebral arteries confirmed atherosclerotic plaque in the left carotid arterial system. (AR 1534.) An ECG confirmed concentric left ventricular hypertrophy and mitral, tricuspid, and pulmonic regurgitation. (AR 1536.)

Doctors admitted Plaintiff to the hospital in mid-May 2017 with right-sided weakness and pain in the right arm. (AR 669.) Examination revealed a right paracorneal hemorrhage. *Id*. Suffering palpitations and dyspnea, Plaintiff presented at the emergency department at the end of May 2017. (AR 1224.) He arrived at the hospital via ambulance in June 2017 with left-sided chest pain. (AR 1239.)

To diagnose ongoing knee pain, doctors ordered x-rays of the knees in June 2017 that confirmed tricompartmental narrowing with osteophytosis and right meniscal calcification and joint effusion. (AR 1843.) In August 2017, Plaintiff presented at the emergency department with dizziness and right-sided chest pain. (AR 1268.) An ECG reflected low voltage QRS. (AR 1280.) In September 2017, he presented with left shoulder pain and nausea. (AR 1288.) In early October 2017, Plaintiff arrived at the emergency department with burning chest pain that radiated to the left shoulder and neck. (AR 1695.) Doctors admitted Plaintiff to the hospital for three days in October 2017 after Plaintiff nearly fainted at home. (AR 674.)

In November 2017, Plaintiff presented for treatment of left hand tingling and numbness as well as headache. (AR 1308.) A CT scan of the brain confirmed general atrophy and ischemic

microangiography. (AR 1318.) Plaintiff presented at the emergency department in late November 2017 with lower extremity numbness and tingling. (AR 1323.) Examination revealed decreased sensation in the left upper and lower extremities. (AR 1326.) A December 2017 MRI of the lumbar spine reflected disc space height loss, circumferential disc bulge with annular fissure, encroachment of the recess, and left neuroforaminal stenosis at L2-L3; left paracentral disc protrusion with left central canal stenosis and encroachment of the lateral recess, focal left foraminal-to-extra foraminal disc protrusion with left neural foraminal stenosis at L3-L4; focal bilateral foraminal disc protrusions with annular fissure protruding to neural foraminal stenosis with degenerative facet changes at L4-L5; and degenerative facet changes and neural foraminal stenosis at L5-S1. (AR 1892.)

Consultative physician Dr. A. Perez examined Plaintiff at the Commissioner's request in February 2016. (AR 295-99.) Examination revealed diminished lumbar range of motion, lumbar tenderness, and diminished left knee range of motion. (AR 297.) Plaintiff demonstrated difficulty tandem walking, standing on the heels, and squatting. *Id.*

The ALJ questioned the VE about the availability of jobs to a hypothetical individual who retained Plaintiff's residual functional capacity (RFC). (AR 52-54.) The VE testified that, while the individual could not perform Plaintiffs' past relevant work, he retained the RFC to perform the jobs of electronics worker, cafeteria attendant, and shipping and receiving weigher. (AR 54.) If the individual was off-task for more than ten percent of the workday or absent from work more than one day each month, he would be precluded from competitive employment. (AR 55.)

The ALJ made the following findings: Plaintiff met the insured status requirement through June 30, 2019 (AR 20); to be eligible for Disability Insurance Benefits, he needed to establish that

he became disabled before this date. He suffered severe medically determinable impairments of hypertension, obesity, degenerative disc disease of the lumbar spine, migraines, osteoarthritis of the lower extremities, degenerative joint disease of the knees, carpal tunnel syndrome of the right upper extremity, fibromyalgia, sleep apnea, neuropathy, and polymyositis. *Id*. He retained the RFC to perform work at the light exertional level but could never climb ladders, ramps, or scaffolds; could not operate foot controls or reach overhead; could frequently handle and finger; and needed to avoid concentrated exposure to noise, vibrations, hazards, and pulmonary irritants. (AR 22-23.) While his impairments could have reasonably been expected to produce the symptoms that he alleged, any statements that addressed the intensity, persistence, or limiting effects of those symptoms were not entirely consistent with evidence. (AR 24.) The state agency medical consultants' medical opinions merited little weight. (AR 26.) While Plaintiff was unable to perform any past relevant work (AR 26), he retained the RFC to perform the jobs of electronics worker, cafeteria attendant, and shipping and receiving weigher. (AR 27.).

In support of remand, Plaintiff first agues that the ALJ erred in failing to identify the evidentiary basis of her assessment of Plaintiff's RFC. The ALJ found that Plaintiff retained the functional capacity to perform work at the light exertional level but could never climb ladders, ramps, or scaffolds; could not operate foot controls or reach overhead; could frequently handle and finger; and needed to avoid  concentrated exposure to noise, vibrations, hazards, and pulmonary irritants. (AR 22-23.) Plaintiff contends that the ALJ identified no evidence that Plaintiff could perform work tasks given these specific limitations. Plaintiff further contends that the ALJ failed to explain how the evidence did not support a more restrictive assessment of the kind of work that Plaintiff could perform.

An ALJ's assessment of a claimant's RFC is her determination of the maximum exertional and non-exertional work-related effort that a claimant can sustain despite the functional restrictions that his impairments produce. SSR 96-8p. An ALJ must include all functional restrictions that the evidence supports in her assessment of a claimant's RFC. *Id. Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). An ALJ must support her assessment of a claimant's RFC with evidence, either objective or subjective. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). An ALJ's failure to identify the evidentiary basis of her assessment of a claimant's RFC mandates remand. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). Once an ALJ finds that none of the available medical opinion evidence accurately accounts for the totality of a claimant's work-related functional restrictions, she faces an "evidentiary deficit" that she may not fill with her own lay understanding of how a claimant's medically determinable impairments limit a claimant's ability to perform work tasks. *Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010). "ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves." *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018).

In the present case, the ALJ had available to her medical opinion evidence that the state agency medical consultants provided. (AR 65-66, 76-78.) The ALJ found that these medical opinions merited little weight, as evidence that was submitted subsequent to the state agency medical consultants' review of Plaintiff's medical history suggested that Plaintiff was more significantly limited than the state agency consultants believed him to be. (AR 26.) Plaintiff argues that once the ALJ found that the available medical opinion evidence did not fully capture the extent of Plaintiff's work-related functional restrictions, she faced an evidentiary deficit that

she could not fill with her own speculation about how Plaintiff's impairments limited his ability to perform work tasks. *Suide*, 371 F. App'x at 690. The ALJ could have relied on Plaintiff's subjective allegations as the evidentiary basis of her assessment of his RFC, but she declined to do so and found that Plaintiff's subjective allegations were not entirely consistent with the evidence. (AR 24.) Plaintiff concludes that the ALJ was then left without evidence to support her assessment of Plaintiff's RFC, and that the ALJ failed to cite specific evidence that established that Plaintiff retained the RFC that she assessed.

Objective medical evidence confirmed that Plaintiff suffered right foraminal narrowing at C3-C5; central, left, and right foraminal stenosis at C5-C6; central canal and foraminal narrowing at C6-C7; disc space height loss, circumferential disc bulge with annular fissure, encroachment of the recess, and left neuroforaminal stenosis at L2-L3; left paracentral disc protrusion with left central canal stenosis and encroachment of the lateral recess, focal left foraminal-to-extra foraminal disc protrusion with left neural foraminal stenosis at L3-L4; focal bilateral foraminal disc protrusions with annular fissure protruding to neural foraminal stenosis with degenerative facet changes at L4-L5; and degenerative facet changes and neural foraminal stenosis at L5-S1. (AR 1892.) Physical examinations reflected tenderness to palpation over the left lateral thigh to the left greater troch muscle (AR 913); decreased range of motion, bony tenderness, swelling, pain, crepitus, spasm, and decreased strength in the right shoulder; tenderness in the wrists; positive Tinel's sign and positive Phalen's sign; swelling, effusion, deformity, tenderness, and lateral collateral ligament tenderness in the left knee; pain and tenderness in the lumbar back (AR 237-38); decreased lumbar range of motion; positive straight leg raise test; positive Stinchfield test (AR 545); decreased sensation in the left upper and lower extremities (AR 1326); and

tricompartmental narrowing with osteophytosis and right meniscal calcification and joint effusion. (AR 1843.) Plaintiff demonstrated difficulty tandem walking, standing on the heels, and squatting. (AR 297.) In addition to the above objective medical imaging and examination findings, Plaintiff frequently presented for treatment of pain that often radiated from the chest into the neck and into the extremities (AR 592 633, 669, 683, 837, 864, 999, 1044, 1083, 1113, 1200, 1268, 1288, 1695), severe headaches (AR 668, 837, 1083, 1308), diffuse tingling and numbness (AR 592, 633, 644, 683, 1143, 1308), chest palpitations (AR 326, 1128, 1224), and weakness. (AR 669, 999, 1200, 1463.)

Plaintiff argues that the ALJ failed to explain how she concluded that, given evidence that reflected degenerative changes in the cervical and lumbar spine, tenderness in the lumbar back, and positive straight leg raise test, Plaintiff could have lifted and carried up to 20 pounds at one time as opposed to fifteen, ten, five, or one pound at one time. Plaintiff notes that the ALJ did not explain how, given evidence of degenerative changes to the spine, decreased sensation in the lower extremities, tenderness in the troch musculature, swelling and degenerative changes in the knees, meniscal calcification, and joint effusion, she ultimately determined that Plaintiff could stand and walk for six hours in an eight-hour day as opposed to five, four, three, two, or one hour in an eight hour day. Plaintiff further notes that the ALJ did not explain why evidence did not support a finding that Plaintiff required the ability to alternate between sitting, standing, and walking or that Plaintiff required additional breaks so that he could rest. Plaintiff claims that the ALJ failed to explain how she determined that Plaintiff could frequently handle and finger where evidence reflected that Plaintiff suffered crepitus and decreased strength in the right shoulder, decreased sensation in the upper extremities, positive Tinel's and Phalen's signs, tenderness in

the wrists, as well as degenerative changes to the cervical spine. Plaintiff further claims that the ALJ did not explain why this evidence did not lead her to find that Plaintiff could occasionally or less-than-occasionally handle or finger. Plaintiff notes that the ALJ failed to explain how she concluded that Plaintiff could perform work at the light exertional level with the postural, manipulative, and environmental restrictions that she assessed given Plaintiff frequent hospitalizations for radiating chest pain, tingling and numbness, headaches, chest palpitations, and weakness in the extremities and the entire body. Plaintiff concludes that the limitations that the ALJ included in her assessment of Plaintiff' RFC were arbitrary and were not grounded in evidence.

Plaintiff argues that the ALJ found some limitations that were entirely illogical. The ALJ, for example, noted that Plaintiff exhibited hand tremors when he attempted to lift the upper and lower extremities. (AR 25.) The ALJ purported to address this symptom by limiting Plaintiff to work that involved no operation of foot controls. *Id.* The ALJ failed to explain how a limitation to operating controls with the feet attempted to address tremors in the hands. The ALJ did not explain how Plaintiff, despite hand tremors, could lift and carry up to 20 pounds for one-third of the workday. The ALJ was required to construct a logical and accurate bridge from the evidence to her conclusion. *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018). Plaintiff notes that no physician opined that Plaintiff retained the RFC that the ALJ assessed and Plaintiff never testified that he could perform work tasks on a full-time basis given the limitations that the ALJ included in her assessment of his RFC. *Garcia v. Colvin*, 741 F.3d 758, 762 (7th Cir. 2013) ("No physician testified—no medical records [re]vealed—that [claimant] has the residual functional capacity ascribed to him by the administrative law judge...").

Plaintiff points out that the ALJ's error was not harmless for several reasons. First, each of the jobs that the ALJ found that Plaintiff could perform - the jobs of electronics worker, cafeteria attendant, and shipping and receiving weigher - require the ability to frequently handle. Had the ALJ found that, due to the aforementioned evidence, Plaintiff could only occasionally handle, Plaintiff could not perform the jobs upon which the ALJ predicated her finding that Plaintiff was not disabled. Second, had the ALJ found that evidence supported that Plaintiff could perform work at no greater than the sedentary exertional level, 20 C.F.R. Part 404, Subpart P, Appendix 2 § 201.10 would have directed the ALJ to find that Plaintiff was disabled as of the date of the ALJ's decision had the ALJ applied the older age category.

20 C.F.R. Part 404, Subpart P, Appendix 2 § 201.10 requires an ALJ to find a claimant who is closely approaching advanced age (age 50-54), who possesses a limited education, and who has acquired no transferable work skills to be disabled if that claimant is limited to work that is performed at the sedentary exertional level. Plaintiff attained age 50 on September 10, 2018. He possessed a limited education. (AR 27.) The ALJ did not find that he possessed transferable work skills. Thus Plaintiff argues that 20 C.F.R. Part 404, Subpart P, Appendix 2 § 201.10 would have mandated a finding of disability as of September 10, 2017, had the ALJ determined that Plaintiff could perform work at no greater than the sedentary exertional level and had the ALJ applied the older age category.

A claimant is in a borderline age where within a few days to a few months of changing age categories. 20 C.F.R. § 404.1563(b). Where a claimant is in a borderline age situation and the application of the older age category will result in an ALJ finding a claimant disabled, an ALJ will not apply the age categories mechanically and will consider whether or not it is appropriate to

apply the older age category based on her evaluation of the overall claim. *Id. See, e.g.*, *Moody v. Berryhill*, 245 F. Supp.3d 1028, 1034 (C.D. Ill. 2017) ("ALJ must, at minimum, identify that there was a borderline age situation before determining which age category to use"); *Pelech v. Colvin*, 2016 WL 727208, *7-8 (N.D. Ill. 2016) (claimant was six months from 50th birthday on date last insured and less than four months from 50th birthday on date when ALJ issued decision; ALJ's recitation of claimant's birthday and age as well as statute that defined him as younger individual did not provide sufficient evidence to allow Court to determine if ALJ considered that older age category could have applied); *Figueroa v. Astrue*, 848 F. Supp.2d 894, 899 (N.D. Ill. 2012) ("there is no statement by the ALJ from which it can be determined that she even considered which category was the appropriate one in which to place the plaintiff. That alone, requires remand"); *Zent v. Astrue*, 2010 WL 5231314, *8 (N.D. Ind. 2010); *Anderson v. Astrue*, 2011 WL 2416265, *11-12 (N.D. Ill. 2011).

In the present case, on the date of the ALJ's decision, Plaintiff was less than six months from attaining age 50. Plaintiff suffered 11 medically determinable severe impairments that afflicted multiple body systems. (AR 20.) He possessed a 10th grade education. (AR 39.) The ALJ did not find that he possessed work skills. Plaintiff thus contends that the ALJ should have recognized that Plaintiff was in a borderline age situation and that the vocational adversities he faced made appropriate application of the older age category which would have then directed the ALJ to find that Plaintiff was disabled on the date of her decision.

Plaintiff also argues that the ALJ erred in failing to identify the frequency with which Plaintiff suffered headaches. The ALJ found that Plaintiff suffered the medically determinable severe impairment of migraine headaches. (AR 20.) While the ALJ acknowledged that Plaintiff

suffered headaches and that he testified that the frequency with which Plaintiff suffered migraine

headaches varied, the ALJ ultimately found that Plaintiff's headaches were not, in fact, limiting.

(AR 26.) The ALJ stated, without accompanying explanation, that the environmental limitations

that she included in her assessment of Plaintiff's RFC adequately addressed Plaintiff's headaches.

*Id*. The ALJ, however, failed to ascertain the frequency with which Plaintiff suffered headaches

and failed to explain how the environmental limitations that she incorporated into her assessment

of Plaintiff' RFC addressed the work-related impact of his headaches.

A medically determinable severe impairment, by very definition, significantly limits a

claimant's ability to perform mental or physical work tasks. 20 C.F.R. § 404.1520(c). An ALJ

errs where she finds that a claimant suffers a medically determinable severe impairment but fails

to find that the impairment produces any work-related functional restrictions. *Indoranto v.*

*Barnhart*, 370 F.3d 470, 474 (7th Cir. 2004). Where an ALJ finds that a claimant suffers

headaches and those headaches constitute a medically determinable severe impairment, an ALJ

must explain how she considers the severity and frequency of those headaches and how the

fluctuating nature of headaches impacts a claimant's ability to work. *Look v. Heckler*, 775 F.2d

192, 195-96 (7th Cir. 1985). *Harris v. Comm'r of Soc. Sec.*, 2017 WL 1191228, *4 (N.D. Ind.

2017); *Kinsey v. Berryhill*, 2017 WL 1101140, *5 (N.D. Ind. 2017).

In the present case, Plaintiff argues that the ALJ was not permitted to find that Plaintiff's

headaches constituted a severe impairment, and then in the narrative discussion component of her

decision, to dismiss those headaches as not limiting. *Parker v. Astrue*, 590 F.3d 920, 924-25

(internal inconsistencies compromise an ALJ's decision); *Carradine v. Barnhart*, 360 F.3d 751,

756 (7th Cir. 2014) ("an administrative agency's decision cannot be upheld when the reasoning

process employed by the decision maker exhibits deep logical flaws...").

Plaintiff notes that, further complicating the ALJ's contradictory findings, was the ALJ's casual comment that, by limiting Plaintiff to work that did not require concentrated exposure to noise, vibration, or pulmonary irritants, the ALJ somehow accounted for the functional limitations that Plaintiff's headaches produced. Yet, the ALJ cited no evidence that exposure to noise, vibrations, or pulmonary irritants triggered or exacerbated Plaintiff's headaches. In December 2016, for example, Plaintiff presented for treatment of a headache that began in the morning. (AR 960.) Plaintiff did not attribute this headache to exposure to loud noise, unusual vibrations, or any dust or fumes. *Id*. Similarly, in April 2017, Plaintiff sought treatment for a headache that was accompanied by elevated blood pressure. (AR 668.) Plaintiff had not been exposed to any of the environmental factors that the ALJ related to Plaintiff' headaches. *Id.* The ALJ failed to explain how, if Plaintiff suffered headaches when he was not exposed to any environmental triggers, prohibiting Plaintiff from working in where such triggers were present would have prevented his headaches. *Spiche*r, 898 F.3d at 757. Plaintiff testified that symptoms of his headaches included blurred vision, weakness in the upper and lower extremities, and pain that radiated throughout the head. (AR 45.) Treatment records reflected that Plaintiff presented with these symptoms. (AR 643, 837, 960, 1083, 1400, 1463.) The ALJ again failed to explain how, by limiting Plaintiff to work that did not involve vibration or pulmonary irritants, Plaintiff could have performed work while suffering a headache if that headache produced impaired vision, upper or lower extremity weakness, and severe pain.

The ALJ did not explain how, by simply restricting Plaintiff to work that did not involve concentrated exposure to noise, Plaintiff could have stood and walked for six hours in an

eight-hour day or how Plaintiff could have continued to lift up to 20 pounds when he experienced weakness in the extremities. The ALJ failed to consider the impact that these symptoms would have had on Plaintiff's ability to perform work tasks. Plaintiff testified that, on average, he suffered headaches that lasted a full day up to two days each week. (AR 44.) The ALJ did not determine if, based on the frequency with which Plaintiff sought medical treatment for headaches, it was reasonable to conclude that Plaintiff did suffer headaches that lasted for a full day up to twice each week. The ALJ failed to explain if or how she considered Plaintiff's ability to perform work tasks despite suffering weakness, blurred vision, and severe pain up to two workdays per week. Again, these symptoms were not triggered by any of the environmental factors that the ALJ discussed, so precluding Plaintiff from working around such factors would not have prevented headache symptoms. The VE testified that an employer could be off-task no more than 10 percent of a workday and could be absent from work no more than one day each month. (AR 55.) If Plaintiff suffered headaches with the frequency that he alleged, and that, due to head pain, blurred vision, weakened extremities, or a combination thereof, he was unable to perform light work tasks up to 90 percent of the workday or was effectively absent from work more than one day each month due to headaches, he would be precluded from competitive employment per the VE's testimony. The ALJ was required to ascertain both the work-related functional limiting effects that Plaintiff's headaches had on his ability to perform work tasks and the frequency with which he suffered those headaches.

Plaintiff also argues that the ALJ erred in failing to explain if or how she considered the combined effect of Plaintiff's medically determinable impairments. The ALJ found that Plaintiff suffered medically determinable severe impairments of hypertension, obesity, degenerative disc

disease of the lumbar spine, migraines, osteoarthritis of the lower extremities, degenerative joint disease of the knees, carpal tunnel syndrome of the right upper extremity, fibromyalgia, sleep apnea, neuropathy, and polymyositis. (AR 20.) The ALJ, however, proffered no discussion of how she considered how the effects of those impairments, when taken in combination, would have affected Plaintiff's ability to perform work tasks. The ALJ did not explain why, when taken in combination, Plaintiff's medically determinable impairments did not produce greater functional restrictions than Plaintiff suffered with any one single impairment in isolation.

An ALJ is required to consider the combined effects of a claimant's medically determinable impairments. SSR 02-1p6; *Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014) ("We keep telling the Social Security Administration's administrative law judges that they have to consider an applicant's medical problems in combination"); *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003). A claimant's obesity may produce aggravating effects on a claimant's additional impairments, especially musculoskeletal impairments. SSR 02-1p. The Seventh Circuit has held that an ALJ errs where she fails to explain why a claimant's musculoskeletal impairments do not produce greater functional restrictions when those impairments are aggravated by a claimant's obesity. *Martinez v. Astrue*, 630 F.3d 693, 698- 99 (7th Cir. 2011) (ALJ failed to consider how obesity affected claimant's knee impairment); *Gentle v. Barnhart*, 430 F.3d 865 868 (7th Cir. 2005) (ALJ failed to evaluate the functional effects of obesity effect of obesity the ability on a claimant who suffered from disc disease); *Barrett v. Barnhart*, 355 F.3d 1065, 1068- 69 (7th Cir. 2004) (obesity made claimant's arthritis a more serious condition and made standing more painful for claimant than had he had arthritis without obesity or obesity without arthritis). If an ALJ finds that a claimant's obesity neither causes nor contributes to

additional functional limiting effects, she must explain how she so concluded. *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012).

In the present case, despite finding that Plaintiff suffered 11 medically determinable impairments, the ALJ failed to discuss if or how she considered that the combined effect of any or all of these impairments may have been more significant than the effect of any single impairment. The ALJ, for example did not explain why Plaintiff's ability to perform work tasks was not more significantly limited given that Plaintiff suffered impairments that affected the lumbar spine as well as the lower extremities, including the knees. The ALJ failed to explain why the pain that these impairments produced in combination would not have further restricted the amount of time that Plaintiff could stand or could walk. The ALJ did not explain if or how she considered the combined effects of fibromyalgia, upper extremity neuropathy, carpal tunnel syndrome, and polymyositis. The ALJ did not explain why the pain, tingling, numbness, and decreased sensation that these impairments produced, when taken together, did not further restrict Plaintiff's use of the upper extremities to lift, to carry, to handle, and to finger. The ALJ did not explain if or how she considered that these impairments could have combined to produce the tingling and weakness for which Plaintiff frequently sought treatment. (AR 318, 598, 633, 669, 732, 1069, 1113. 1143, 1200, 1323, 1463.)

Aside from a brief two sentence reference that obesity could potentially aggravate a claimant's impairments, generally, and that the effects of obesity were considered in assessing Plaintiff's RFC, the ALJ provided no actual discussion of if or how she considered the aggravating effects of Plaintiff's obesity. The ALJ, for example, did not explain why she did not conclude that Plaintiff's knee or lumbar spinal impairments were not more functionally limiting

when considered in combination with his obesity than if Plaintiff suffered the musculoskeletal impairments alone. The ALJ did not explain why Plaintiff did not suffer increased pain given the extra weight or why Plaintiff's ability to stand and to walk or to lift and to carry were not more significantly limited when the ALJ factored the effects of Plaintiff's obesity. The ALJ did not explain the effects of Plaintiff's obesity on his hypertension or how obesity may have aggravated Plaintiff's hypertension and produced more significantly debilitating headaches than had Plaintiff suffered from hypertension and not from both hypertension and obesity. If the ALJ found that obesity did not aggravate any of Plaintiff's medically determinable impairments and did not independently produce functional limiting effects, the ALJ was required to explain how she reached such a decision. *Arnett*, 676 F.3d at 593.

In response, the Commissioner argues that the ALJ committed no error in assessing Plaintiff's RFC despite rejecting all medical opinion evidence as well as Plaintiff's subjective allegations. The Commissioner's argument consists largely of a recitation of the same objective findings that the ALJ summarized in her recitation of Plaintiff's medical history. While the Commissioner documents many of Plaintiff's treatment records as well as various objective findings, the Commissioner, much like the ALJ, fails to explain how this objective medical evidence supported the specific functional restrictions that the ALJ included in her assessment of Plaintiff's RFC. The Commissioner, like the ALJ, offers no explanation of why the ALJ did not find that additional functional restrictions were warranted based on the evidence that the ALJ summarized.

As noted, an ALJ's assessment of a claimant's RFC is her determination of the maximum exertional and non-exertional work-related effort that a claimant can sustain despite the

limitations that his impairments produce. SSR 96-8p. An ALJ must include all functional restrictions that evidence supports in her assessment of a claimant's RFC. *Id*.; *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). An ALJ must predicate her assessment of a claimant's RFC on evidence, either objective or subjective. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). An ALJ's failure to identify the evidentiary basis of her assessment of a claimant's RFC mandates remand. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

Once an ALJ determines that none of the available medical opinion evidence accurately accounts for the totality of a claimant's functional restrictions, an ALJ faces an "evidentiary deficit" that she may not fill with her lay understanding of how a claimant's impairments restrict his ability to perform work tasks. *Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010). "ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves." *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir.2018).

Here, it is clear that the ALJ created an evidentiary deficit when she rejected the available medical opinion evidence. *Suide*, 371 F. App'x at 690. The ALJ created reversible error when she engaged in a series of speculative independent medical findings that were based on nothing more than her lay medical intuition. *Lambert*, 896 F.3d at 774. Objective medical evidence indicated right foraminal narrowing at C3-C5; central, left, and right foraminal stenosis at C5-C6; central canal and foraminal narrowing at C6-C7; disc space height loss, circumferential disc bulge with annular fissure, encroachment of the recess, and left neuroforaminal stenosis at L2-L3; left paracentral disc protrusion with left central canal stenosis and encroachment of the lateral recess, focal left foraminal-to-extra foraminal disc protrusion with left neural foraminal stenosis at L3-L4; focal bilateral foraminal disc protrusions with annular fissure protruding to neural foraminal

stenosis with degenerative facet changes at L4-L5; degenerative facet changes and neural foraminal stenosis at L5-S1 (AR 1892); tenderness to palpation over the left lateral thigh to the left greater troch muscle (AR 913); decreased range of motion, bony tenderness, swelling, pain, crepitus, spasm, and decreased strength in the right shoulder; tenderness in the wrists; positive Tinel's sign and positive Phalen's sign; swelling, effusion, deformity, tenderness, and lateral collateral ligament tenderness in the left knee; pain and tenderness in the lumbar back (AR 237-38); decreased lumbar range of motion; positive straight leg raise test; positive Stinchfield test (AR 545); decreased sensation in the left upper and lower extremities (AR 1326); and tricompartmental narrowing with osteophytosis and right meniscal calcification and joint effusion. (AR 1843); impaired tandem walking, standing on the heels, and squatting. (AR 297.)

The Commissioner summarizes some of the aforementioned evidence as well as evidence that the ALJ cited that reflected minimal abnormal findings. The Commissioner, however, fails to articulate how, when looked at altogether, the evidence of record that the ALJ considered supported a finding that Plaintiff could perform work at the light exertional level with the postural, manipulative, and environmental limitations that the ALJ found. The Commissioner contends, essentially, that the ALJ considered the objective medical history as well as Plaintiff's subjective allegations and divined somehow that the evidence established that Plaintiff could perform work with the given RFC. Thus the Commissioner offers *ipse dixit* reasoning that, like the ALJ's decision, is devoid of the level of detail that the ALJ was required to provide in her decision. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (ALJ must supply level of detail in decision that permits meaningful judicial review and allows ALJ to trace path of ALJ's reasoning). A mere summary of evidence, as the Commissioner and ALJ provide, does not

substitute for meaningful analysis of evidence. *Young v. Sec'y of Health and Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992). SSR 96-8p required the ALJ to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." The ALJ provided no such analysis.

The Commissioner asserts that the ALJ reasonably found that, at a November 2017 examination, Plaintiff's musculoskeletal examination was normal and that Plaintiff, therefore, could perform work at the light exertional level. The Commissioner fails to explain how a single musculoskeletal examination supported the ALJ's reasoning. The ALJ failed to explain how, given evidence of degenerate facet changes and stenosis in the lumbar spine, tenderness in the hip, positive straight leg raise test, and impaired tandem walking, the ALJ determined that Plaintiff retained the capacity to lift and to carry up to 20 pounds at one time as opposed to fifteen pounds, ten pounds, five pounds, or one pound. The ALJ failed to explain how this evidence supported a finding that Plaintiff could stand and walk for a total of six hours in an eight-hour day as opposed to five hours, four hours, three hours, two hours, or one hour.

Similarly, while the Commissioner contends that the ALJ found that, due to shoulder pain, Plaintiff could not reach overhead, neither the Commissioner nor the ALJ address actual evidence of Plaintiff's shoulder impairment. The ALJ did not explain why only a limitation to overhead reaching was appropriate where evidence reflected decreased shoulder strength, crepitus, and bony tenderness. The ALJ did not explain why Plaintiff's ability to lift and to carry was not further limited given the extent of his shoulder impairment. The Commissioner fails to explain how the ALJ determined that Plaintiff could frequently, as opposed to occasionally or never,

handle and finger, where evidence reflected not only crepitus and shoulder weakness but evidence of degenerative changes to the cervical spine and evidence that suggested that Plaintiff suffered carpal tunnel syndrome.

The Commissioner contends that the ALJ reasonably found that Plaintiff could not operate foot controls based on evidence of tremors in the lower extremities. *Id.* At the same examination, Plaintiff demonstrated tremors in the hands as well as the legs. The ALJ did not explain why tremors in the lower extremities warranted inclusion of a functional restriction in Plaintiff' RFC but tremors in the upper extremities did not warrant any functional restriction. The ALJ was required to construct a logical and accurate bridge from the evidence to her conclusion. *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018). While the Commissioner notes that Plaintiff demonstrated normal grip strength and was able to overcome gravity and resistance, the ALJ did not cite this evidence to explain why she did not include a functional restriction that was based on Plaintiff's hand tremors in her assessment of Plaintiff's RFC. The Commissioner's argument is, therefore, impermissible post-hoc rationalization. *Hardy v. Berryhill*, 908 F.3d 309, 313 (7th Cir. 2018) ("the ALJ's decision cannot be defended on a basis not articulated in her order); *Hanson v. Colvin*, 760 F.3d759, 762 (7th Cir. 2014) ("We are particularly concerned about the *Chenery* violations committed by the government because it is a recurrent feature of the government's defense of denials of social security disability benefits, as this court has noted repeatedly"); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("We have made clear that what matters are the reasons articulated by the ALJ").

The Commissioner contends that the ALJ reasonably found that no physician opined that Plaintiff could not work or that Plaintiff suffered greater functional restrictions than the ALJ

found. The absence of a medical opinion that stated that Plaintiff was disabled did not provide the ALJ with license to create an RFC assessment that was grounded in nothing more than the ALJ's lay assessment of objective medical evidence. *Lambert*, 896 F.3d at 774. Once the ALJ recognized that Plaintiff was more significantly limited than the state agency medical consultants found him to be, the ALJ should have summoned a medical expert who could have reviewed all pertinent evidence and who could have offered a reasoned opinion of Plaintiff's RFC that was grounded in his professional assessment of evidence. *Alaura v. Colvin*, 797 F.3d 503, 506 (7th Cir. 2015); *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000). That the ALJ ultimately concluded that Plaintiff was more limited than the state agency medical consultants originally believed him to be did not absolve the ALJ of the responsibility to explain how specific evidence supported the specific functional restrictions that she included in her assessment of Plaintiff's RFC. SSR 96-8p; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

The Commissioner maintains that the ALJ committed no error in assessing the functional limiting effects of Plaintiff's headaches. The Commissioner contends that the ALJ acknowledged that Plaintiff testified that he sometimes suffered headaches twice each week and that some weeks Plaintiff suffered no headaches. *Id*. The Commissioner asserts that, while the ALJ found that Plaintiff's headaches were not limiting, the ALJ included functional restrictions that related to Plaintiff's headaches in her assessment of Plaintiff's RFC. *Id*. The Commissioner's argument ignores that the ALJ found that migraine headaches constituted a medically determinable severe impairment. (AR 20.) A severe impairment, by definition, limits a claimant's ability to perform work activity. 20 C.F.R. § 404.1520(c). The ALJ's decision contained logically inconsistent findings. She first determined that Plaintiff's headaches constituted a severe impairment and

therefore limited his ability to perform work tasks but then later dismissed headaches and found them to be not severe. Internal inconsistencies compromise an ALJ's decision. *Parker v. Astrue*, 597 F.3d 920, 924-25 (7th Cir. 2010). To the extent that the ALJ accounted for any limiting effects that headaches produced, the ALJ failed to explain how the functional restrictions that she attributed to Plaintiff's headaches were logically connected to Plaintiff's headaches. The ALJ found that, due to migraine headaches, Plaintiff needed to avoid concentrated exposure to noise, vibration, and pulmonary irritants. (AR 26.) The ALJ, however, did not logically connect a limitation to exposure to noise, vibration, and pulmonary irritants to Plaintiff's headaches.

The Commissioner offers no clarification or insight and contends only that the ALJ satisfied her obligation to consider the limiting effects of Plaintiff's headaches by including environmental limitations in her assessment of Plaintiff's RFC. Neither the Commissioner nor the ALJ cite any evidence that reflected that Plaintiff's headaches were triggered or exacerbated by exposure to noise, vibration, or pulmonary irritants. When Plaintiff presented for treatment of a headache in December 2016, he stated that the headache began sometime in the morning. (AR 960.) He did not state that he had been exposed to noise, to vibration, or to pulmonary irritants. *Id*. In April 2017, Plaintiff sought treatment for a headache that occurred at a time when his blood pressure was elevated. (AR 668.) Again, Plaintiff had not been exposed to noise, to vibration, or to pulmonary irritants. *Id*. Evidence reflected that, when Plaintiff suffered a headache, blurred vision and upper extremity weakness accompanied head pain. (AR 643, 837, 960, 1083, 1400, 1463.) The ALJ did not explain why, if Plaintiff suffered impaired vision and impaired upper extremity strength, she did not include functional restrictions that addressed these symptoms. The ALJ did not explain, for example, why she did not include the need to take unexpected breaks to

deal with blurred vision and severe head pain in her assessment of Plaintiff's RFC. The ALJ did not explain why she did not further limit the amount of weight that Plaintiff could lift and carry to account for upper extremity weakness. The ALJ's inclusion of a limitation that precluded Plaintiff from concentrated exposure to noise, vibration, and pulmonary irritants was in no way logically connected to the triggers of his headaches or to the symptoms that headaches produced. *Spicher*, 898 F.3d at 757.

The Commissioner also asserts that the ALJ committed no error in failing to explain how she considered the effects of Plaintiff's obesity. The Commissioner contends that the ALJ recognized that SSR 02-1p stated that a claimant may suffer greater functional restrictions where a claimant suffers a combination of obesity and other medically determinable impairments. *Id.* The Commissioner maintains that the ALJ stated that she considered the effects of obesity on Plaintiff's functional capacity and that the ALJ noted that the results of a musculoskeletal examination that was conducted in November 2017 was normal. *Id.* The Commissioner further contends that Plaintiff did not testify about the effects of obesity and that Plaintiff did not articulate how obesity produced or contributed to work-related functional restrictions.

The Commissioner's argument ignores that SSR 02-1p imposes on the ALJ the duty to analyze the effects of a claimant's obesity. *Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014); *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003). The Seventh Circuit has held that an ALJ errs where she fails to explain why a claimant's musculoskeletal impairments do not produce greater work-related functional restrictions where obesity aggravates those impairments. *Martinez v. Astrue*, 630 F.3d 693, 698-99 (7th Cir. 2011); *Gentle v. Barnhart*, 430 F.3d 865 868 (7th Cir. 2005); *Barrett v. Barnhart*, 355 F.3d 1065, 1068- 69 (7th Cir. 2004). If an ALJ finds that

a claimant's obesity neither causes nor contributes to additional functional restrictions, she must explain how she so reasoned. *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012). The ALJ's cursory reference to having considered Plaintiff's obesity provided no insight into how she actually evaluated obesity when she assessed Plaintiff's RFC. The ALJ did not explain why she did not credit Plaintiff's allegations that he suffered significant limitations when he walked, where Plaintiff suffered disc space height loss, circumferential disc bulge with annular fissure, encroachment of the recess, and left neuroforaminal stenosis at L2-L3; left paracentral disc protrusion with left central canal stenosis and encroachment of the lateral recess, focal left foraminal-to-extra foraminal disc protrusion with left neural foraminal stenosis at L3-L4; focal bilateral foraminal disc protrusions with annular fissure protruding to neural foraminal stenosis with degenerative facet changes at L4-L5; and degenerative facet changes and neural foraminal stenosis at L5-S1 (AR 1892) as well as swelling, effusion, deformity, tenderness, and lateral collateral ligament tenderness in the left knee (AR 237-38) and right knee tricompartmental narrowing with osteophytosis, meniscal calcification, and joint effusion. (AR 1843.)

The ALJ did not explain why, given evidence of both lower back and knee impairments, obesity did not pose greater limitations in standing and walking. The ALJ did not explain why obesity would not have aggravated the pain that these impairments produced. Additionally, Plaintiff presented for treatment of chest pain that radiated into the extremities (AR 592 633, 669, 683, 837, 864, 999, 1044, 1083, 1113, 1200, 1268, 1288, 1695), tingling and numbness (AR 592, 633, 644, 683, 1143, 1308), chest palpitations (AR 326, 1128, 1224), and weakness. (AR 669, 999, 1200, 1463.)

The ALJ did not explain how she considered the effects that obesity may have had in

producing these symptoms. The ALJ did not explain how she considered the effects of Plaintiff's impairments in the aggregate. The ALJ did not explain how she concluded that Plaintiff could sustain work at the light exertional level on a full-time basis where Plaintiff suffered degenerative changes in the shoulder, lumbar spine, and knees; severe headaches; chest pain and palpitations; transient numbness; and weakness. The ALJ did not explain why this evidence, when taken as a whole, did not support further limiting Plaintiff's RFC.

Due to the myriad deficiencies in the ALJ's evidentiary basis of her assessment of Plaintiff's RFC, remand is required.

Next, Plaintiff argues that the ALJ erred in finding that Plaintiff's subjective allegations were not entirely consistent with evidence. In assessing Plaintiff's subjective allegations that addressed the intensity, persistence, and limiting effects of his symptoms, the ALJ found that "the claimant's impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and the other evidence in the record..." (AR 24.) The Seventh Circuit has criticized use of similar phraseology ("not entirely credible"), dismissing it as "meaningless boilerplate." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Martinez*, 630 F.3d at 696 (ALJ failed to identify which of claimant's statements he found to be not credible or how credible or not credible he found the statements to have been when he concluded that claimant's allegations were not entirely credible); *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010) (ALJ did not explain what he intended when he found claimant's allegations to have been not entirely credible). An ALJ must supply sufficient detail in her analysis that permits the Court to conduct meaningful judicial review and to trace the path of the

ALJ's reasoning. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

In the present case, Plaintiff argues that the ALJ did not identify which of Plaintiff's subjective allegations she found to be consistent with evidence, which allegations she found be inconsistent with evidence, or how consistent with evidence she found any particular allegation to be. The ALJ, for example, failed to explain if she found Plaintiff's allegation that he needed to sit for several hours after sitting for 20-to-30 minutes (AR 40) to be consistent with evidence, inconsistent with evidence, or how consistent with evidence she found this particular allegation to be. The ALJ did not explain if she found Plaintiff's allegation that he experienced tingling and numbness in the wrists (AR 47) to be consistent with evidence, inconsistent with evidence, or how consistent with evidence she found this allegation to be. In finding that Plaintiff's allegations were not entirely consistent with evidence, the ALJ presumed that, for the ALJ to credit any of Plaintiff's subjective allegations that addressed his limitations and restrictions, Plaintiff's statements needed to be entirely consistent with evidence. This contradicts the Commissioner's own regulations as well as Seventh Circuit case law which require that an ALJ apply the preponderance of the evidence standard. 20 C.F.R. § 404.953(a); *Jones ex rel. Jones v. Chater*, 101 F.3d 509, 512 (7th Cir. 1996) (citation omitted). *See also, e.g., Minger v. Berryhill*, 307 F. Supp.3d 865, 872 (N.D. Ill. 2018); *Wartak v. Berryhill*, 2018 WL 4561339, *9 (N.D. Ind. 2018) ("The ALJ demanded in this case that allegations be 'entirely consistent' with the medical and other evidence, which is a different, more rigorous standard"). The preponderance of the evidence standard requires an ALJ to accept a fact where relevant evidence as a whole "shows that the existence of the fact to be proven is more likely than not." 20 C.F.R. § 404.901.

Plaintiff points out that, aside from use of the impermissible boilerplate phraseology, the

ALJ offered no additional analysis of Plaintiff's pain or symptoms. SSR 16-3p describes how an ALJ must evaluate a claimant's alleged pain and symptoms. First, an ALJ must determine if a claimant suffers a medically determinable impairment that could reasonably produce the type of pain or symptoms that a claimant alleges. *Id*. If an ALJ finds that a claimant suffers a medically determinable impairment that could reasonably produce the type of pain that a claimant alleges, an ALJ must determine if objective medical evidence alone substantiates the intensity, persistence, and limiting effects of pain or of symptoms that a claimant describes. *Id.* If an ALJ finds that objective medical evidence alone fails to support a claimant's subjective allegations, an ALJ must evaluate those allegations by explaining how she considers the factors that SSR 16-3p enumerates. However, "where the medical signs and findings reasonably support a claimant's complaint of pain, the ALJ cannot merely ignore the claimant's allegations." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (citation omitted).

Here, Plaintiff contends that the ALJ failed to explain if or how she considered objective medical evidence when she evaluated Plaintiff alleged pain and symptoms. Plaintiff alleged that he suffered severe leg and back pain after standing for 20-to-30 minutes. (AR 40.) A December 2017 MRI of the lumbar spine reflected that Plaintiff suffered degenerative facet changes, central canal stenosis, and disc protrusion and fissure. (AR1892.) Degenerative facet changes can produce low back pain that radiates into the buttocks. Lumbar central canal stenosis can produce pain and weakness in the legs that causes cramping when walking and that is alleviated by sitting. Disc protrusions decrease dexterity and mobility and cause back pain that radiates to the lower extremities. The ALJ did not explain why objective medical evidence alone did not substantiate Plaintiff's allegations of back and leg pain or his description of how his ability to stand and walk

was limited by his lumbar spinal symptoms.

Similarly, evidence confirmed that Plaintiff suffered cervical foraminal narrowing and stenosis. (AR 547.) Cervical spinal stenosis can produce numbness, tingling, and weakness in the arms, hands, and fingers; neck pain; and difficulty walking. The ALJ did not explain why evidence of multilevel cervical spinal stenosis did not, by itself, substantiate Plaintiff's allegations of tingling and numbness in the arms, wrists, and hands; his severe neck pain; or his difficulty walking. In addition to cervical stenosis, evidence reflected tenderness in the wrists and positive Tinel's and Phalen's signs. (AR 237-38.) Positive Tinel's and Phalen's signs indicate nerve root compression at the wrists. The ALJ did not explain why evidence of cervical spinal stenosis and nerve root compression at the wrists did not support Plaintiff's allegations of wrist pain and numbness. The ALJ failed to explain how she considered objective evidence that related to either Plaintiff's chest pain or his migraine headaches.

Plaintiff frequently presented for treatment of diffuse chest pain that was sometimes accompanied by palpitations or shortness of breath. (AR 326, 670, 1044, 1128, 1239, 1695.) Objective evidence confirmed that Plaintiff suffered from cardiomegaly with left ventricle hypertrophy; collateralization of venous flow about the left chest wall (AR 1020); atherosclerotic plaque in the left carotid arterial system (AR 1534); left ventricular hypertrophy and mitral, tricuspid, and pulmonic regurgitation. (AR 1536.) Cardiomegaly can produce chest pain, shortness of breath, dizziness, and palpitations. Ventricular hypertrophy may produce similar symptoms. The ALJ did not explain why, given objective evidence that confirmed that Plaintiff suffered from the very impairments that could produce the cardiac symptoms that he alleged, it was unreasonable to credit those allegations and to craft an RFC that reflected that Plaintiff

frequently suffered chest pain, shortness of breath, and palpitations.

While the ALJ failed to explain if or how she considered objective evidence and how that objective evidence, by itself, substantiated Plaintiff's allegations of pain and symptoms, the ALJ compounded her error by failing to discuss any of the factors that SSR 16-3p required her to consider. If an ALJ finds that objective medical evidence alone fails to substantiate a claimant's allegations of pain and symptoms, an ALJ must evaluate those allegations by considering a claimant's:

> (d)aily activities; (t)he location, duration, frequency, and intensity of pain or other symptoms; (f)actors that precipitate and aggravate the symptoms; (t)he type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (t)reatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (a)ny measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and(a)ny other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. *Id*.

Here, the ALJ's decision contained no analysis of any of the aforementioned factors. The ALJ, for example, failed to explain if or how she considered Plaintiff's limited activities of daily living. Plaintiff testified that, due to pain that occurred when he stood and walked, he did not perform household chores such as washing dishes or doing laundry. (AR 41.) He developed neck, arm, and back pain after performing these tasks for 20 minutes at one time. SSR 16-3p requires an ALJ to explain how she considers a claimant's activities of daily living when she evaluates a claimant's subjective allegations. A claimant can perform activities of daily living at his own pace, when his pain is least severe, and may rely on others to assist him; but he would not be afforded such accommodation in a competitive workplace. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Here, the ALJ failed to explain if or how she considered Plaintiff's activities of

daily living when she evaluated his subjective allegations. Plaintiff notes also that the ALJ failed to explain why Plaintiff would have limited his activities of daily living unless he suffered the type of debilitating pain and symptoms that he described. Also, the ALJ erred in failing to explain how she determined that Plaintiff could perform work tasks for eight hours each day, five days every week, when he struggled to complete basic activities of daily living at his own pace and on his own schedule.

In response to Plaintiff's assertions, the Commissioner argues that the Court should not disturb the ALJ's assessment of Plaintiff's subjective allegations, because that assessment was not patently wrong. As the Seventh Circuit has held, a Court "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support. *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence. *Id*. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). Here, however, the ALJ's assessment of Plaintiff's subjective allegations was patently wrong, for the ALJ relied on inferences that were not logically based on specific findings or evidence.

The Commissioner further asserts that the ALJ committed no error in relying on boilerplate language that found Plaintiff's subjective allegations to be not entirely consistent with the evidence. The Commissioner contends that the ALJ's use of the empty boilerplate language did not constitute error, as the ALJ provided additional explanation of how she assessed Plaintiff's subjective allegations. *Id*. The Commissioner's argument, however, overlooks that the very substance of the boilerplate language was error and not the ALJ's mere reliance on it. By rejecting Plaintiff's subjective allegations because those allegations were not entirely consistent

with the evidence, the ALJ applied an impermissibly strict evidentiary standard. Based on the plain language of the ALJ's decision, the ALJ rejected Plaintiff's subjective allegations because Plaintiff failed to demonstrate that those allegations were entirely consistent with evidence. This was a stricter standard than the preponderance of the evidence standard, which the ALJ was required to apply. 20 C.F.R. § 404.953(a); *Jones ex rel. Jones v. Chater*, 101 F.3d 509, 512 (7th Cir. 1996) (citation omitted). The preponderance of the evidence standard requires an ALJ to accept a fact where relevant evidence "shows that the existence of the fact to be proven is more likely than not." 20 C.F.R. § 404.901. To the extent that the ALJ provided additional explanation beyond the boilerplate language, the additional language did not salvage the ALJ's analysis, for the ALJ's language suggested that, in evaluating Plaintiff's subjective allegations, she required Plaintiff to demonstrate that those allegations were entirely consistent with evidence. This court has held that, by finding a claimant's subjective allegations to be not entirely credible, the remainder of the ALJ's analysis is tainted, as the ALJ may have demanded a stricter burden of proof. *See, e.g., Ralston v. Saul*, 2019 WL 5558789, *4 (N.D. Ind. 2019); *Minger v. Berryhill*, 307 F. Supp.3d 865, 872 (N.D. Ill. 2018); *Wartak v. Berryhill*, 2018 WL 4561339, *9 (N.D. Ind. 2018).

The Commissioner contends that the ALJ reasonably considered that Plaintiff's subjective allegations were not entirely consistent with the evidence because the objective medical evidence did not support Plaintiff's allegations of debilitating pain. However, the Commissioner, like the ALJ, did not identify any specific medical evidence that contradicted Plaintiff's specific subjective allegations. First, the ALJ failed to supply the level of detail in her decision that permits meaningful judicial review or to allow the Court to trace the path of her reasoning. *Scott*

*v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Throughout the ALJ's decision, the ALJ provided an overview of Plaintiff's medical history, with references to certain appointments with physicians and objective medical findings. The ALJ's decision, however was devoid of meaningful analysis, and a recitation of Plaintiff's medical history did not replace actual analysis of that evidence. *Young v. Sec'y of Health and Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992). Second, the ALJ was not permitted to reject Plaintiff's allegations of pain and symptoms simply because objective medical evidence did not substantiate those allegations. *Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014) (collecting cases). If an ALJ determines that objective evidence alone does not substantiate a claimant's allegations of pain and symptoms, an ALJ must then evaluate a claimant's subjective allegations by applying the factors that SSR 16-3p enumerates. As Plaintiff argues, not only did the ALJ fail to explain why significant objective evidence did not support Plaintiff's subjective allegations, but the ALJ also failed to explain how she evaluated Plaintiff's subjective allegations with respect to the SSR 16-3p factors.

The Commissioner argues that the ALJ relied on Plaintiff's activities of daily living to find that Plaintiff's subjective allegations were not entirely consistent with evidence. The Commissioner asserts that the ALJ considered that Plaintiff climbed stairs to enter his home, performed household chores, and attended religious services. *Id.* The ALJ, however, did not actually discuss these activities in her decision. The Commissioner's argument is, therefore, impermissible post-hoc rationalization. *Hardy v. Berryhill*, 908 F.3d 309, 313 (7th Cir. 2018); *Hanson v. Colvin*, 760 F.3d759, 762 (7th Cir. 2014); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011).

Finally, the Commissioner contends that the ALJ reasonably considered Plaintiff's

statement that he could sit for up to six hours and that he used over-the-counter pain medication. While the ALJ made these statements, the ALJ attached no significance to them and failed to explain how the ability to sit for six hours or the use of pain medication rendered Plaintiff's subjective allegations not entirely consistent with evidence. These statements, standing alone, failed to elucidate how the ALJ determined that Plaintiff had exaggerated any statements about the intensity, persistence, or limiting effects of his impairments or how the ALJ determined that Plaintiff retained the capacity to perform work at the light exertional level. The ALJ did not attempt to construct a logical and accurate bridge from this evidence to any conclusion about Plaintiff's subjective allegations. *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018). The Commissioner, by simply repeating the ALJ's observations, offers no additional insight.

As the ALJ erred in her evaluation of Plaintiff's subjective complaints, remand is warranted.

Conclusion

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

Entered: March 2, 2020.

s/ William C. Lee
William C. Lee, Judge
United States District Court